Frederick L. Whitmer
**KILPATRICK TOWNSEND &
  STOCKTON LLP**
The Grace Building
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 775-8700
Facsimile:  (212) 775-8800
Email: fwhitmer@ktslaw.com

*Counsel to NCR Voyix Corporation*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NCR VOYIX CORPORATION,<br><br>    Plaintiff,<br><br>v.<br><br>EMBARCADERO TECHNOLOGIES EUROPE LIMITED,<br><br>    Defendant. | Civil Case No. _____<br><br>**COMPLAINT** |

Plaintiff, NCR Voyix Corporation, files this Complaint against Defendant, Embarcadero Technologies Europe Limited ("Embarcadero"), alleging as follows:

**NATURE OF THE ACTION**

1. This is an action for breach of contract and declaratory judgment arising from Embarcadero's refusal to abide by the terms of a March 31, 2023 settlement agreement (the "Settlement Agreement").[1] The Settlement Agreement resolved previous claims between the parties under a May 2016 VAR Agreement (the "VAR Agreement"), which granted NCR Voyix

---

[1] The Settlement Agreement contains a confidentiality provision limiting disclosure of the terms of the agreement and related matters. NCR has not attached a copy of the Settlement Agreement to this Complaint, but will file a motion for permission to file the Settlement Agreement under seal. Similarly, the Complaint does not quote the Settlement Agreement, but instead summarizes the relevant provisions in compliance with the confidentiality provision.

Corporation (formerly known as NCR Corporation and referred to herein as "NCR") a license to incorporate Embarcadero's InterBase software into NCR's proprietary Storepoint software.

2. Storepoint is a retail operational system that offers comprehensive front-of-house and back-of-house solutions. NCR's customers use Storepoint to handle a variety of business processes, ranging from point-of-sale, customer loyalty programs and benefits, ordering and inventory management, and internal customer management. Storepoint uses Embarcadero's InterBase software to support its back-of-house functions.

3. NCR's customers rely on its software. If Storepoint goes down, customers lose key business functionalities, disrupting their operations. In turn, software failures cause NCR to suffer reputational harm and lost market share.

4. NCR pays Embarcadero a one-time license fee for each so-called "activation" of InterBase. This means the amount payable to Embarcadero increases with each device or authorized user added by NCR's customers to the Storepoint platform.

5. After a dispute arose concerning the number of software activations, Embarcadero agreed in the Settlement Agreement that NCR and its customers could continue using all licenses or sublicenses provided by Embarcadero as of March 31, 2023 without paying an additional fee or penalty. As later explained by Embarcadero's longtime account manager for NCR, Kirstin Challis, this arrangement allowed NCR's customers to reinstall existing licenses after decommissioning old hardware or other performing maintenance without incurring additional license fees. (*See* Paragraph 43, below.) The Settlement Agreement also established a new pricing rate for additional activations that post-dated settlement.

6. In the months following execution of the Settlement Agreement, Embarcadero claimed more than 2,000 additional activations by NCR's customers and invoiced NCR more than $800,000 in license fees. But NCR's own investigation established that these purported activations

2

were merely maintenance-related reinstallations, not net new activations. Moreover, NCR determined that it had not sold a single instance of Storepoint during the relevant timeframe, and without Storepoint sales there should not have been additional activations of InterBase software.

7.      Embarcadero has admitted that it cannot distinguish between such reinstallations (which incur no fee) and additional activations (which incur a fee). All the same, Embarcadero rejected NCR's explanation for the reinstallations as "unlikely" without offering any rationale or evidence for its position.

8.      In an apparent effort to leverage payment of the disputed license fees, Embarcadero began deactivating NCR customer licenses in early 2024 without any notice to NCR, causing massive disruptions to NCR's customers and irreparable harm to NCR's goodwill, reputation, and business opportunities. Embarcadero initially deactivated licenses for NCR customer Love's Travel Stops ("Love's") in January 2024 then reactivated the licenses on NCR's demand a few days later. Embarcadero claimed that NCR's customer had likely reinstalled their licenses on new hardware, which Embarcadero detected as new, unauthorized activations, leading to the shutdown. But this explanation made no sense, as the affected NCR customer reported deactivations after simply rebooting its hardware, not reinstalling any licenses.

9.      Over the next several weeks, NCR and Embarcadero continued their attempts to negotiate an amicable resolution of the license fee dispute. As Embarcadero is well aware, Storepoint is a legacy platform, and NCR does not have a technical solution that allows it to monitor or manage customer activations. As a result, NCR's investigation into the disputed activations required substantial time and effort, outside its normal course of business.

10.     As NCR's investigation continued into March and April 2024, Embarcadero again deactivated licenses for three of NCR's enterprise customers—all of whose licenses predated the Settlement Agreement and therefore could remain in use without payment of additional fees. As

3

with the January deactivations, Embarcadero gave no warning that it would shut down customer licenses, wreaking havoc on NCR's business reputation and customer base.

11. At NCR's urging, Embarcadero reactivated the affected licenses in late April 2024 and agreed in principle to a "standstill" agreement that would prevent further shutdowns while the parties worked in good faith to resolve the activation dispute. But on Friday, June 7, Embarcadero withdrew its agreement in principle to the standstill. Instead, Embarcadero threatened that it would cease further deactivations only if NCR paid the disputed license fees or entered a new license agreement on terms highly favorable to Embarcadero.

12. NCR files this action, seeking temporary and preliminary injunctive relief to prevent further deactivations and maintain the status quo until the Court decides the parties' rights in the licensed software.

## PARTIES, JURISDICTION, AND VENUE

13. NCR is a Maryland corporation with a principal place of business in Atlanta, Georgia. NCR is a world-leading digital commerce provider. Every month, more than a billion items are sold through NCR's point-of-sale technology by NCR's customers across the globe.

14. Embarcadero is a private limited company organized under the laws of England with a principal place of business in London. *See EMR (USA Holdings), Inc. v. Goldberg*, No. 18-cv-07849 (ER), 2019 WL 5537878, at *14 (S.D.N.Y. June 15, 2022) ("A UK private limited company is treated as a corporation for the purposes of diversity subject matter jurisdiction . . . and is deemed to be a citizen of the State or foreign state where it has its principal place of business.") (cleaned up).

15. This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1332(a)(2) because it is between a citizen of a state and a citizen of a foreign state and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

16. Venue is proper in this Court under 28 U.S.C. § 1391 because the parties agreed under the Settlement Agreement that the state and federal courts situated in Manhattan had exclusive jurisdiction and venue for disputes arising from or relating to the Settlement Agreement. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Wynn Las Vegas, LLC*, 509 F. Supp. 3d 38, 50 (S.D.N.Y. 2020) (finding that parties were subject to a contractual forum selection clause and were "deemed to reside" in the Southern District of New York for the purpose of venue).

## FACTUAL ALLEGATIONS

**I.   NCR licenses Embarcadero's InterBase software for use in NCR's proprietary Storepoint platform.**

17. In May 2016, NCR and Embarcadero entered into the VAR Agreement under which Embarcadero licensed its InterBase software to NCR. A true and correct copy of the VAR Agreement is attached hereto as Exhibit 1.

18. The VAR Agreement authorizes NCR to use InterBase as a platform to develop NCR's own software, and "to market and distribute [InterBase] with or as part of [NCR's] application to Resellers, Distributors and end users." Ex. 1 ("VAR Agmt.") § 3(iii).

19. As consideration, NCR agreed to pay Embarcadero a license fee for each NCR developer license and end-user sublicense of InterBase. *Id.* § 6. Under this pricing scheme, the license fees payable to Embarcadero would increase with each additional end-user that activated its sublicensed software. *Id.*; *see also id.* Sch. 1 (setting out initial per-license rates).

20. Section 6 provides, in pertinent part, that "[o]wnership of . . . all licenses purchased by [NCR] or [NCR's] customers [under the VAR Agreement] . . . shall be deemed to have passed to [NCR] once [Embarcadero] ha[s] made the Software available for download by [NCR] or [NCR's] customer[s], notified [NCR] of the availability of the Software for download and [Embarcadero] ha[s] provided [NCR] with all license keys necessary for the installation and operation of the Software." *Id.* § 6 (emphasis added).

5

21. Section 6 of VAR Agreement further explains that "[a]ll license fees and prepaid royalty fees are noncancellable and non-refundable regardless of the number copies of the Software."

22. Thus, the VAR Agreement contemplated a one-time fee paid by NCR for the licensed software, after which NCR or its customer could use the licensed software indefinitely.

23. Section 5 of the VAR Agreement also required NCR to submit monthly sales reports to Embarcadero. Notably, Section 5 only required NCR to report "Software sales," not activations or deployments of licensed software.

24. Sales and activations are distinct concepts. For example, NCR might sell a customer a license that allowed that customer to activate 10 instances of Storepoint. Although the sale would close on one day, it might be weeks or months before the customer activated all 10 instances of the software by installing them on customer hardware or assigning them to the customer's authorized users.

25. NCR uses InterBase to support back-of-house functions for NCR's proprietary Storepoint platform, including inventory management and ordering, enterprise-level pricing controls, and internal customer management. These functions support NCR's customers in identifying and executing on high-level business strategies.

26. NCR's customers do not license InterBase independently, instead only using it as part of the Storepoint platform. In fact, Section 3 of the VAR Agreement prohibits NCR from licensing InterBase "as a standalone product."

27. Moreover, InterBase is merely a database. It would offer no benefit or functionality to an NCR customer as a standalone solution without an instance of Storepoint.

28. Thus, there is no logical reason that an NCR customer would "activate" an InterBase license absent a corresponding sale of the Storepoint product.

**II.     After a dispute arose regarding the number of sublicense activations, the parties entered into the Settlement Agreement in March 2023 to clarify their contractual rights as to existing and future activations of the licensed software.**

29.     The parties performed under the VAR Agreement without issue until 2022, when Embarcadero began claiming that the number of end-user sites "calling home" through InterBase exceeded the number of licenses purchased by NCR—in other words, that NCR had not paid for all the activated sublicenses.  NCR disputed this claim, but determined to seek an amicable resolution to avoid disruptions to its customers' businesses.

30.     The parties therefore entered into the Settlement Agreement on March 31, 2023.

31.     Under the Settlement Agreement, NCR agreed to make a substantial settlement payment to resolve the overdeployment dispute in exchange for mutual general releases for any claims arising under the VAR Agreement.

32.     Under the Settlement Agreement, the parties expressly agreed and clarified that no license fees or penalties would be incurred by NCR or its end users for the continued use of licenses in existence as of March 31, 2023.

33.     The Settlement Agreement also provided that NCR would pay a certain price for all additional activations post-dating settlement.  The parties also entered a Schedule No. 3 to the VAR Agreement memorializing the unit pricing in the Settlement Agreement.

34.     The Settlement Agreement further obligated Embarcadero to give NCR written notice of any additional activations within 30 days of detection.

35.     Unlike the VAR Agreement, which required NCR to report software *sales*, the Settlement Agreement required Embarcadero to report only *additional activations*.  These disparate reporting requirements reflected the parties' recognition that only Embarcadero could determine whether NCR's customers had exceeded their number of sublicensed applications.  The

parties also specifically discussed during negotiations of the Settlement Agreement that Embarcadero, not NCR, would be responsible for all new license tracking and reporting.

36. The Settlement Agreement also provided for application of New York law and required any dispute about the Settlement Agreement to be filed in the state or federal courts of Manhattan.

**III. Within months after executing the Settlement Agreement, Embarcadero begins claiming an additional $800,000 in royalties for overdeployment, including claims for software licenses that predated the March 2023 Settlement Agreement.**

37. In September 2023, Embarcadero contacted NCR and claimed that more than 2,000 additional licenses had been activated between April and September 2023. Embarcadero issued an invoice on September 8 for $299,250 for licenses allegedly activated between April 1 and June 30, 2023, then issued a second invoice on September 29, 2023 for alleged activations between July 1 and September 12, 2023, claiming a balance due of $502,500.

38. Again, the Settlement Agreement expressly required Embarcadero to report new activations to NCR within 30 days after detection by Embarcadero, and Embarcadero later admitted it was aware of certain alleged activations as early as April 17, 2023. NCR received no notice of the activations until August 24 at the earliest, when Embarcadero provided an "Audit Report" spreadsheet purporting to show data on activations as of July 28, 2023. But the audit report omitted key information, including identification of the customers involved or the piece of hardware implicated. These critical omissions prevented NCR from verifying the information. Moreover, the report cited hundreds of licenses created as early as 2016 and 2017 that were only activated in 2023, an assertion NCR found incredible.

39. Similarly, Embarcadero did not report the alleged activations from July 1 to September 12 until it sent the September 29 invoice, which claimed without any substantiation that a quantity of 1,340 licenses had been activated.

40. In an effort to avoid additional surprise invoices, NCR directed Embarcadero on September 12, 2023 to stop "any further license activations of previously settled licenses."

41. After investigating these alleged new activations, NCR concluded that they reflected replacement activations of existing license keys already in use at the time of execution of the Settlement Agreement. In other words, the activations did not reflect any net additional activations on customers' hardware, but rather the transfer of previously activated licenses to different, replacement, or recommissioned servers or hardware in the course of ordinary maintenance. As a result, the Settlement Agreement authorized continued use of the licenses without additional payment.

42. This position was not only consistent with the express terms of the Settlement Agreement, but also comported with Embarcadero's understanding and admission that such redeployed licenses did not constitute additional activations under the Settlement Agreement.

43. For example, Kirstin Challis, the longtime account manager for NCR and Embarcadero's Regional Manager for Europe, Middle East, and Asia, explained in an August 15, 2023 email: "If a customer needs to decommission an old machine and recommission a new machine, this is covered under the license. (It does not include moving of licenses to different customers.)" A true and correct copy of the foregoing email is attached hereto as Exhibit 2 and is incorporated herein by reference.

44. Similarly, in later correspondence between the parties' attorneys, counsel for Embarcadero represented that Embarcadero had sought to verify that its list of additional activations "in fact [reflected] a net new license to a new machine." The concept of "a net new license" would be entirely irrelevant if redeployment of an existing license constituted an additional activation under the Settlement Agreement; Embarcadero's recognition of that concept indicated its understanding that additional activations under the Settlement Agreement only

9

included net new activations, not redeployments of existing licenses to new hardware. A true and correct copy of the foregoing email is attached here to as Exhibit 3 and is incorporated herein by reference.

45. NCR flagged this issue by email to Embarcadero on November 6, 2023, asking for documentation that the invoices reflected net new activations. But instead of responding to NCR's request, counsel for Embarcadero sent a demand letter on November 21, 2023, demanding payment of the $800,000 in royalties for the alleged post-settlement activations. Once again, however, Embarcadero failed to offer any evidence substantiating the July-September activations, and simply relied on the incomplete "Audit Report" to evidence the claimed April-June activations.

46. NCR responded to the demand letter on December 5, 2023, explaining that the alleged "new" activations were actually redeployments, and flagging Embarcadero's failure to issue timely written notices of the activations as required by the Settlement Agreement.

47. Counsel for Embarcadero responded by email on December 11, submitting a more detailed spreadsheet broken down by customer and device for the alleged activations. In the email, Embarcadero admitted that it had not distinguished between activations for new NCR clients or for reinstallations in new devices for existing NCR clients. Instead, Embarcadero claimed that it relies on its customers to furnish such information. *See* Ex. 3.

48. Embarcadero's counsel explained that Embarcadero had sought "to verify if the data showed [in the spreadsheet] . . . was in fact a net new license to a new machine." Ex. 3 (emphasis omitted). Again, the effort to distinguish between redeployments and "net new licenses" indicates Embarcadero's recognition that the two events would be treated differently under the Settlement Agreement.

49. All the same, Embarcadero dismissed as "unlikely" NCR's explanation that the activations reflected redeployments from decommissioned hardware. Embarcadero did not provide any rationale or evidence supporting this position.

50. NCR responded on December 27, challenging Embarcadero's position on the software redeployments. As explained in the letter, NCR could not identify any new sales of software to the customers with disputed activations. Because NCR's customers generally license NCR's Storepoint application rather than licensing InterBase directly, a customer would not need to activate a new InterBase license unless NCR had sold a corresponding new Storepoint license. Without any new sales, NCR explained, the disputed activations "appear[ed] to be break-fixes and/or reinstalls on new hardware, as is routine in maintenance across a large customer base." NCR also asked that that Embarcadero provide any evidence it might have that would contradict NCR's explanation for the "new" activations. Embarcadero did not provide any contradictory evidence, but suggested to NCR (including by telephone call on January 11, 2024) that it could and would provide such evidence.

IV. **Despite failing to substantiate its claims of net new activations, Embarcadero repeatedly turned off NCR's customer licenses without notice to NCR in early 2024, preventing NCR's customers from accessing crucial back-of-house functions in the Storepoint platform.**

51. NCR and Embarcadero continued to exchange phone calls and correspondence into early 2024 in an effort to resolve the dispute over new activations.

52. But on January 15, 2024, an NCR customer, Love's, reported to NCR that it had received error messages identifying a "Registration file error" and could not operate existing, active software licenses after rebooting its hardware.

53. The Love's software licenses predated the Settlement Agreement and therefore the Settlement Agreement authorized their continued use without additional payment.

54. When NCR contacted Embarcadero to investigate, an Embarcadero support representative indicated that the license had "be[en] deactivated pending some legal negotiations between our two companies" and could not be reactivated at the time. A true and correct copy of the foregoing email is attached hereto as Exhibit 4 and is incorporated herein by reference.

55. The Embarcadero representative further claimed (erroneously) that the deactivation was authorized by an agreement between NCR and Embarcadero. *Id.* Notably, the Love's error messages occurred upon reboot only, not initial install of the software, demonstrating Embarcadero's inability to distinguish between hardware redeployment and actual "new" activations.

56. The deactivation caused massive disruption to Love's business. Because InterBase supports the non-customer facing functions of Storepoint, such as inventory management, ordering, and enterprise-level pricing controls, the deactivation prevented Love's from executing its business strategies. The deactivation also prevented Love's from operating its customer loyalty program, an impact with outsize effect on Love's customer-retention efforts. In turn, the deactivation also caused harm to NCR's goodwill and reputation—above all else, NCR's customers require reliable operational solutions, which the deactivation prevented NCR from providing. The deactivation therefore harmed NCR's reputation in the eyes of actual and prospective customers alike.

57. In light of the damage suffered by NCR and its customer due to the surprise deactivation, in a January 18 email NCR demanded the immediate reactivation of the Love's licenses. Embarcadero claimed to have reactivated the licenses by the following week, but Embarcadero's resolution required Love's to uninstall and reinstall the server software before it could use the licensed software again, further disrupting the customer's business.

58. After reactivating the Love's licenses, Embarcadero claimed in a February 8, 2024 email that it deactivated the licenses pursuant to NCR's September 2023 direction not to authorize further license activations. Embarcadero also admitted in the email that it could not distinguish between net new activations and redeployment activations, and represented that the Love's licenses appeared to have been additional activations rather than redeployments. Embarcadero further claimed "that existing activated licenses of InterBase should not have had any issues and would remain active."

59. The parties engaged in further negotiations through March 2024, but in mid-March Embarcadero once again deactivated several of NCR's customer's licenses.

60. TravelCenters of America ("TA"), an NCR customer, reported on March 8 that it was experiencing issues with InterBase. By March 12, TA reported that the issue had grown into "an emergency" because TA "no longer ha[d] a working copy of Interbase at [the affected] franchise," resulting in business disruptions. A true and correct copy of the foregoing email is attached hereto as Exhibit 5 and is incorporated herein by reference.

61. On March 28, Love's once again reported error messages showing a "Registration file error." A true and correct copy of the foregoing email is attached hereto as Exhibit 6 and is incorporated herein by reference. As with the January deactivation, this caused major business disruption to Love's. A Love's representative explained that the affected systems "[we]re servers hosting core processes for our stores, so [Love's] can't afford any prolonged downtime and . . . currently ha[s] systems [that Love's] can't reboot without the issue reoccurring."

62. NCR contacted Embarcadero on April 9 to address the deactivations. As NCR explained to Embarcadero in an email sent April 10, in light of the demands for a resolution from NCR customers, NCR would be forced to take legal action unless Embarcadero reactivated the Love's and TA licenses.

63. In response, Embarcadero claimed that it had not disabled any existing licenses, but instead had changed the license status to deactivated to prevent future activations of those licenses when NCR customers redeployed existing, activated licenses to new machines.

64. Contrary to this explanation, however, Love's had reported deactivation on simple reboots, not from moving licenses from one machine to another. Moreover, Embarcadero's deactivation of the licenses prevented NCR customers from moving existing software from decommissioned machines to new machines, a process that Embarcadero previously agreed was allowed under the Settlement Agreement.

65. In other words, by attempting to characterize as "additional activations" the redeployments of existing licenses from decommissioned hardware or in the normal course of maintenance, Embarcadero effectively sought to charge NCR twice for the same licenses. This position flies in the face of the VAR Agreement (which remains valid) and the parties' historical dealings, under which NCR would pay a one-time, non-refundable license fee in exchange for the right to indefinite use of the licensed software.

V. **NCR attempts to negotiate a standstill agreement with Embarcadero, but Embarcadero walks away and threatens to deactivate NCR customer licenses once again unless NCR pays more than $800,000.**

66. Love's, TA, and a third NCR customer, Pilot, continued experiencing unexplained license deactivations through April 23, 2024. At that time, NCR informed Embarcadero that NCR would initiate legal action unless the parties could agree in principle to a "standstill" agreement allowing continued operation of licenses in effect on March 31, 2023.

67. The parties agreed in principle to the standstill agreement in early May 2024, then negotiated specific provisions of the agreement over the next several weeks.

68. During a phone call on June 7, 2024, however, Embarcadero withdrew its agreement in principle to the standstill agreement. Instead, Embarcadero indicated that it would

14

not cease further deactivations of customer licenses unless NCR paid the disputed $800,000 in royalties or agreed to a new license agreement with an annual cost of $1.2 million.

69. Although NCR is not aware of additional deactivations since the June 7 phone call, in light of Embarcadero's previous deactivations of Love's, TA, and Pilot's licenses NCR fears that Embarcadero will deactivate additional NCR customer licenses to leverage payment for the $800,000 in royalties that NCR disputes in good faith.

70. All conditions precedent have been performed or waived.

## COUNT I
## Breach of Settlement Agreement

71. NCR repeats and re-alleges the averments in paragraphs 1 through 70 of the Complaint as if fully set forth herein.

72. The Settlement Agreement is governed by New York law and constitutes a valid contract between NCR and Embarcadero.

73. The Settlement Agreement requires Embarcadero to permit continued use of all licenses and sublicenses provided to NCR and its customers as of Mach 31, 2023.

74. As reflected in the express terms of the Settlement Agreement and as further admitted by Embarcadero in its August 15, 2023 email, Ex. 2, the continued use permitted by the Settlement Agreement includes redeployment of a license from one machine to another in connection with decommissioning old machines or performing system maintenance.

75. Embarcadero has breached the Settlement Agreement by deactivating licenses that were activated by NCR or its customers as of March 31, 2023.

76. This breach has proximately caused damage to NCR, including but not limited to reputational harm. Based on Embarcadero's June 7, 2024 threat that it will terminate additional customers after the parties' reached an impasse on the standstill agreement, NCR fears that it will

suffer additional reputational harm, especially if, as a result of Embarcadero's threatened action, its enterprise customers lose access to their licensed software.

77. NCR is entitled to a judgment against Embarcadero in an amount to be proved at trial for breach of the Settlement Agreement and for preliminary and permanent injunctive relief and specific performance of the Settlement Agreement, which provides and confirms that NCR and its customers own the software once Embarcardero activated the software.

## COUNT II
### Declaratory Judgment

78. NCR repeats and re-alleges the averments in paragraphs 1 through 70 of the Complaint as if fully set forth herein.

79. Together with its previous deactivations of NCR's customers, Embarcadero's June 7, 2024 threat to deactivate customer licenses leave NCR uncertain as to its rights under the Settlement Agreement and whether it is required to pay twice for the software that it has previously purchased. NCR is therefore entitled to a declaratory judgment and asks this Court to determine its rights with respect to licenses in existence as of March 31, 2023.

80. There is an actual and justiciable controversy that is of sufficient immediacy to warrant judicial relief under 28 U.S.C. § 2201. A prompt resolution of the dispute regarding the parties' rights with respect to pre-settlement licenses is necessary to protect NCR from further reputational harm.

81. NCR requests entry of a declaratory judgment that further deactivations by Embarcadero of pre-settlement licenses would breach the Settlement Agreement.

### PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, NCR prays for the following relief:

(1) That the Court enter judgment in favor of NCR and against Embarcadero;

(2) That the Court enter a temporary restraining order and grant preliminary injunctive relief preventing Embarcadero from further deactivations of licenses predating the Settlement Agreement while this lawsuit is pending and enter permanent injunctive relief at trial;

(3) That the Court declare that further redeployments of licenses predating the Settlement Agreement in the course of decommissioning old hardware or performing routine maintenance does not qualify as an "additional activation" under the Settlement Agreement;

(4) That the Court tax all costs against Embarcadero; and

(5) That the Court grant such other relief as is just and proper.

Dated: June 10, 2024

/s/ *Frederick L. Whitmer*
Frederick L. Whitmer
**KILPATRICK TOWNSEND &
   STOCKTON LLP**
The Grace Building
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: fwhitmer@ktslaw.com

*Counsel to NCR Voyix Corporation*