UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────

NCR VOYIX CORPORATION,

                Plaintiff,

      - against -

EMBARCADERO TECHNOLOGIES EUROPE
LIMITED,

                Defendant.

─────────────────────────────────

24-cv-4458 (JGK)

MEMORANDUM OPINION
AND ORDER

JOHN G. KOELTL, District Judge:

    This case involves a contract dispute between a software company and one of its licensees. NCR Voyix Corp. ("NCR"), the plaintiff and licensee, alleges that the software licensor, Embarcadero Technologies Europe Limited ("Embarcadero"), breached the parties' agreement by deactivating the software licenses of some of NCR's customers. NCR brings a claim for breach of contract and seeks a declaratory judgment that similar deactivations in the future will constitute breach of contract.

    Embarcadero asserts counterclaims against NCR, also for breach of contract and for declaratory relief. Embarcadero claims that NCR failed to pay for certain software activations as required by their contract and seeks a declaratory judgment that NCR's breach was material. The parties now cross-move for summary judgment. For the following reasons, the parties' motions for summary judgment are **denied.**

**I.**

The following facts are based on the parties' Local Civil Rule 56.1 statements and supporting papers, which are undisputed unless otherwise noted.

**A.**

NCR is a global digital commerce solutions provider that sells a retail-operational program called "Storepoint" to convenience stores and fuel retailers. Pl.'s Rule 56.1 Statement ("NCR's 56.1 Statement") ¶¶ 1, 9, ECF No. 87. NCR customers install Storepoint on in-store servers, which connect to cash registers, fuel pumps, and similar devices. Id. ¶ 10.

On May 20, 2016, NCR entered into a Value-Added Reseller Agreement (the "VAR Agreement") with Embarcadero. NCR's 56.1 Statement ¶ 1; see also Decl. of Bennett Richardson Supp. Pl.'s Mot. Summ. J. ("Richardson Moving Decl."), Ex. 1, ECF No. 89-1. Embarcadero owns a software called "Interbase," which provides data security and encryption for retail business applications like Storepoint. Def.'s Rule 56.1 Statement ("Embarcadero's 56.1 Statement") ¶ 1, ECF No. 72. The VAR Agreement grants NCR a license to incorporate Interbase into Storepoint and to sublicense the use of Interbase to NCR's end-users through Storepoint. NCR's 56.1 Statement ¶ 2. Interbase allows Storepoint to track inventory, loyalty points, and similar data. Id. ¶¶ 11-12.

2

In exchange for the right to use and to sublicense Interbase to end-users through Storepoint, NCR agreed to pay Embarcadero a one-time license fee each time NCR issued a license. Embarcadero's 56.1 Statement ¶ 6; NCR's 56.1 Statement ¶ 3. Embarcadero authorized NCR to sell and distribute two kinds of licenses: (1) an Interbase Server +1 Simultaneous User license for $75 per deployment and (2) an Interbase Server +10 Simultaneous Users license for $750 per deployment. Embarcadero's 56.1 Statement ¶ 14; see also Decl. of Christopher DeGennaro Supp. Def.'s Mot. Summ. J. ("DeGennaro Moving Decl."), Ex. 7 at NCR-EMB-0000008165, ECF No. 75-7. As the names suggest, the distinction between the two kinds of licenses lies in the number of "users" — that is, the devices connected to the server running Storepoint — that can install Interbase. For example, an NCR customer that purchases an Interbase Server +1 Simultaneous User license can install Storepoint (and thus Interbase) onto one of its servers plus one user, such as a fuel pump or a cash register. Embarcadero's 56.1 Statement ¶ 15.

Under the VAR Agreement, NCR was responsible for tracking and reporting the number of licenses it sold. Id. ¶ 16. Section 5 of the VAR Agreement provided that NCR would periodically provide Embarcadero "with a written monthly sales report ... summarizing the [Interbase] sales during the previous calendar month for royalty bearing copies of [Interbase] sold or

distributed by [NCR] or on [NCR's] behalf."[1] Id. ¶ 7; see also DeGennaro Moving Decl., Ex. 7 at NCR-EMB-0000008161. Section 6 of the VAR Agreement provided that NCR would pay fees based on its sales of Interbase, as reported by NCR to Embarcadero, on a sliding scale basis under Schedule No. 1 of the VAR Agreement. Embarcadero's 56.1 Statement ¶ 9; see also DeGennaro Moving Decl., Ex. 7 at NCR-EMB-000008161-62.

### B.

In 2021, a dispute arose between NCR and Embarcadero over purported overuse of Interbase by NCR. According to Embarcadero, NCR sold more licenses than those for which it paid Embarcadero and had provided customers with Interbase Server +10 Simultaneous Users licenses when it reported to Embarcadero sales of Interbase Server +1 Simultaneous User licenses. Embarcadero's 56.1 Statement ¶¶ 21, 26; see also DeGennaro Moving Decl., Ex. 1, Transcript of the Deposition of Kyle Wheeler, December 17, 2024 ("Wheeler Dep. Tr.") at 30:21-31:19, ECF No. 75-1.

NCR for its part acknowledged that it underreported the number of licenses sold to its customers but insisted that it did not misreport the kind of Interbase licenses it had sold.

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

4

Pl.'s Rule 56.1 Counterstatement ("NCR's 56.1 Counterstatement") ¶¶ 25-26, ECF No. 96. Instead, NCR contended that it paid Embarcadero for Server +1 licenses, but Embarcadero, without explanation, provided NCR customers with "slip files" containing Server +10 licenses. Id. ¶ 26.

The parties resolved the over-deployment dispute through a two-phased settlement. First, NCR agreed to pay Embarcadero $262,575.63 for the Interbase licenses it in fact sold to NCR's customers up until that point. Embarcadero's 56.1 Statement ¶¶ 29, 32, 33. Second, the parties set out to negotiate how to address NCR's purported misreporting of the kind of Interbase licenses it sold.

As part of the phase-two negotiation, Embarcadero provided NCR with "call home reports," which Embarcadero claimed accurately identified Interbase activations. Id. ¶ 36. Whenever Interbase is installed on a device, the software "pings" Embarcadero's internal licensing software called Sanctuary to confirm the validity of the license. Id. ¶¶ 37, 40; see also Richardson Moving Decl., Ex. 8, Transcript of the Deposition of Stephen Ball, December 19, 2024 ("Ball Dep. Tr.") at 27:3-17, ECF No. 89-8. This process is known as "calling home." When the software successfully calls home, it generates a certificate on the end-user server confirming the software's authenticity.

NCR's 56.1 Statement ¶ 50; see also Ball Dep. Tr. at 27:3-28:25; 38:11-18.

Embarcadero contends that NCR "reviewed, analyzed, and evaluated the data reflected in the call home reports, and agreed that it would serve as the basis for the amount to be paid to Embarcadero in connection with phase 2 of the Parties' two-phase settlement." Embarcadero's 56.1 Statement ¶ 49. NCR, by contrast, contends that it "used the call-home data in concert with the results of its own internal investigations." NCR's 56.1 Counterstatement ¶ 49; see also Decl. of Bennett Richardson Opp'n Summ. J. Mot. ("Richardson Opp'n Decl."), Ex. 39, Transcript of the Deposition of Tony Cusack, January 15, 2025 ("Cusack Dep. Tr.") at 94:23-25, ECF No. 99-22.

On March 31, 2023, the parties resolved the dispute by executing a Settlement and Release Agreement (the "Settlement"). NCR's 56.1 Statement ¶ 33. Under the Settlement, NCR agreed to pay Embarcadero ▉▉▉▉▉ in exchange for a mutual general release of claims arising out of the dispute. Id. ¶ 34; Embarcadero's 56.1 Statement ¶ 51; see also Richardson Moving Decl., Ex. 4 §§ 2-3, ECF No. 89-4. The Settlement also modified the VAR Agreement's pay-per-license framework prospectively. NCR's 56.1 Statement ¶ 35; see also Richardson Moving Decl., Ex. 4 §§ 4-5. Section 4 of the Settlement provides that

6

> all licenses and sublicenses to the Subject Interbase Software provided to [NCR] and end users as of March 31, 2023 are permitted for continued use by the Parties without additional license fees or penalties. If additional activations of such licensed and sublicensed Subject Interbase Software are made after March 31, 2023, such additional activations will be at the newly agreed pricing set forth in Schedule No. 3....

Id. § 4. Section 5 of the Settlement provides that after

> March 31, 2023, the Parties hereby agree that the price for all new licenses and new activations and deployments of [Interbase] under the Schedule No. 2 shall be ▮▮▮▮▮ per unit. Concurrently with the execution of this Settlement Agreement, the Parties shall enter into a separate Schedule No. 3 memorializing this new pricing and the terms set forth in Section 4 above.

Id. § 5.

The parties memorialized this new fee structure in Schedule No. 3 to the VAR Agreement, which provides that "[c]ommencing on March 31, 2023, Embarcadero and [NCR] hereby agree that the price for all new licenses and new activations and deployments of Interbase ... under the VAR Agreement shall be ▮▮▮▮▮ per unit." Richardson Moving Decl., Ex. 6 § 2, ECF No. 89-6. "[A]ll deployed and activated licenses and sublicenses to Interbase ... provided to [NCR] and end-users on and prior to March 31, 2023, are permitted for continued use and support by [NCR] and such end-users without any additional license fees or penalties other than those set forth in the Settlement." Id. § 3. "If additional activations of Interbase ... are made after

7

March 31, 2023, such additional activations will be at the pricing set forth in" Schedule No. 3, and Embarcadero is required to notify NCR "of any such additional activations no later than thirty (30) days of detecting or identifying them." Id. "Except as expressly modified and amended" in Schedule No. 3, "the VAR Agreement ... remain[ed] in full force and effect." Id. § 5.

c.

Sometime after the parties executed the Settlement, another dispute about over-deployment arose, although the parties disagree about when the dispute arose.

Embarcadero claims that it notified NCR during an April 17, 2023 conference call that Embarcadero had identified approximately 400 additional activations in April 2023. Embarcadero's 56.1 Statement ¶¶ 66-67; see also DeGennaro Moving Decl., Ex. 22 at EMBARC0005767, ECF No. 75-22. Embarcadero identified these alleged additional activations using its call-home data. Embarcadero's 56.1 Statement ¶ 67.

NCR, by contrast, contends that Tony Cusack, the Executive Director of NCR, attended the April 17, 2023 conference call and did not recall any discussion of additional activations. NCR's 56.1 Counterstatement ¶ 66. Instead, NCR claims to have first learned of the alleged additional activity in September 2023, when NCR received Embarcadero's invoices. Id. ¶ 67; Cusack Dep. Tr. at 136:13-23. On September 8, 2023, Embarcadero issued

8

invoice number Q-1679270, which identified 798 additional activations between April 1, 2023 and June 30, 2023. Embarcadero's 56.1 Statement ¶ 83; see also DeGennaro Moving Decl., Ex. 30 at NCR-EMB-000003959, ECF No. 75-30. On September 29, 2023, Embarcadero issued invoice number Q-1688341, which identified 1,340 additional activations between July 1, 2023 and September 12, 2023. Embarcadero's 56.1 Statement ¶ 84; see also DeGennaro Moving Decl., Ex. 31 at NCR-EMB-000002069, ECF No. 75-31.

After receiving those invoices, NCR protested that the alleged activations were not "additional activations" within the meaning of the Settlement, but nonbillable customer maintenance efforts that were improperly flagged in Embarcadero's call-home reports. Specifically, when an end-user reinstalls Interbase or replaces certain hardware in a server, such as the hard drive or motherboard, Interbase calls home again. NCR's 56.1 Statement ¶ 51; Ball Dep. Tr. at 38:16-40:2, 66:4-14. It is therefore possible for routine maintenance to cause the same server to call home multiple times.

To avoid counting installations on the same server more than once, Embarcadero attempts to deduplicate its call-home data using a "unique identifier" called a "DeviceID." NCR's 56.1 Statement ¶ 53. If the same DeviceID appears multiple times in the call-home reports, Embarcadero considers it only once for

9

invoicing purposes. DeviceIDs are not generated by Interbase, but rather by the underlying server's operating system. Id. ¶ 55; see also Ball Tr. Dep. at 82:19-84:14. NCR claimed, however, that Embarcadero's deduplication efforts failed to account for certain common events that both cause the software to call home again and generate new DeviceIDs. For example, according to NCR, its customers use a process called "imaging" to install, update, and support software like Storepoint. NCR's 56.1 Statement ¶ 15. Imaging software involves taking a copy of the data on a fully configured server in the form of an image file and pasting it onto the customer's server. Id. ¶ 16; Decl. of Robert Usner ("Usner Decl.") ¶ 12, ECF No. 88. NCR contends that its customers frequently "reimage" servers to update or fix software. Reimaging does not physically change the server hardware, NCR's 56.1 Statement ¶ 24, but it does generate a new DeviceID when the underlying hardware is reimaged, id. ¶ 56; see also Richardson Moving Decl., Ex. 3, Transcript of the Deposition of Robert Usner, January 16, 2025 ("NCR Usner Dep. Tr.") at 97:10-25, 160:9-161:11, ECF No. 89-3. NCR's customers also replace server hardware when it breaks down or becomes obsolete. NCR's 56.1 Statement ¶ 28. Replacing certain server hardware, like the server's hard drive or motherboard, will also generate a new DeviceID. Id. ¶ 60; see also Ball Dep. Tr. at 84:19-86:23.

NCR ultimately refused to pay the two September 2023 invoices because it concluded that the alleged activations between April 1, 2023 and September 12, 2023 were caused by reimaging and hardware maintenance. NCR's 56.1 Statement ¶ 65. NCR noted, for example, that it was invoiced for 605 additional activations by TravelCenters of America ("TA") between April and September 2023, even though NCR was unaware of any new TA sites opening during that time. Id. ¶¶ 66-67. NCR instead concluded that the alleged additional activations coincided with two reimaged servers per TA site as well as several additional reimages to correct software issues. Id. ¶ 68; see also Richardson Moving Decl., Ex. 10 at NCR-EMB-000015135, ECF No. 89-10. Furthermore, eighty-eight percent of the activations for which Embarcadero invoiced NCR during this period occurred in a two-month period, which NCR concluded was consistent with standard software updates. NCR's 56.1 Statement ¶ 69.

**D.**

On September 12, 2023, NCR requested that Embarcadero stop further activations for existing licenses. Embarcadero's 56.1 Statement ¶ 87; see also DeGennaro Moving Decl., Ex. 32 at NCR-EMB-000008563, ECF No. 75-32. Specifically, Cusack stated that "Embarcadero need[s] to stop these activations." Embarcadero's 56.1 Statement ¶ 87; see also DeGennaro Decl., Ex. 32 at NCR-EMB-000008563.

In November 2023, Embarcadero began to deactivate NCR's customers' licenses in phases. Embarcadero's 56.1 Statement ¶ 95; see also Wheeler Dep. Tr. at 144:2-6. At least three NCR customers — Love's Travel, Pilot, and TA — experienced Storepoint software failure because their existing Interbase licenses were disrupted. Embarcadero's 56.1 Statement ¶ 98; see also DeGennaro Moving Decl., Ex. 3, Transcript of the Deposition of Robert Usner, January 16, 2025 ("Embarcadero Usner Dep. Tr.") at 167:21-168:5, ECF No. 75-3. Embarcadero contends that these Storepoint disruptions were caused by NCR's customers, which used "technical workarounds to undermine Embarcadero's deactivation of their licenses, sometimes at NCR's direction." Embarcadero's 56.1 Statement ¶ 102; see also Embarcadero Usner Dep. Tr. at 200:20-204:10, 210:4-211:4. NCR, by contrast, contends that these outages occurred only after its customers attempted to reboot servers to reinstall Interbase. NCR's 56.1 Counterstatement ¶ 101. According to NCR, these disruptions were catastrophic for its customers, which rely on Storepoint to operate retail sites. See id. ¶ 98.

On April 12, 2024, NCR requested that Embarcadero reactivate all deactivated licenses. Embarcadero's 56.1 Statement ¶ 105. Embarcadero did so. Id. ¶ 106. According to Embarcadero, however, NCR's customers again started causing additional activations of Interbase, which Embarcadero then invoiced to NCR.

12

Id. ¶¶ 107-08. Between April 17, 2024 and April 16, 2025, Embarcadero identified another 2,151 activations, totaling $806,625 in license fees. Id. ¶ 109. From April 1, 2023 through April 16, 2025, Embarcadero identified 4,289 alleged additional activations by NCR's customers totaling $1,608,375. Id. ¶ 110. NCR again claimed that these alleged activations were caused by reimaging and hardware maintenance rather than additional activations within the meaning of the Settlement.

On June 10, 2024, NCR brought this action, alleging that Embarcadero breached the Settlement by wrongfully deactivating end-user Interbase licenses that existed as of the date of the Settlement. NCR also seeks a declaratory judgment that future deactivation of Interbase licenses that existed as of the date of the Settlement will constitute a breach of that agreement.

On July 23, 2024, Embarcadero asserted two counterclaims. First, Embarcadero alleges that NCR breached the Settlement by failing to pay license fees for the alleged additional activations after the Settlement. Second, Embarcadero seeks a declaratory judgment that NCR materially breached the Settlement and therefore Embarcadero may terminate the VAR Agreement and Settlement. Following discovery, Embarcadero moved for summary judgment in its favor on its counterclaims and against NCR on NCR's claims. NCR in turn moved for summary judgment against Embarcadero on Embarcadero's counterclaims.

13

## II.

The standard for granting summary judgment is well established. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable in-

14

ferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

If there are cross-motions for summary judgment, the Court must assess each of the motions and, drawing all reasonable inferences against the party whose motion is under consideration, determine whether either party is entitled to judgment as a matter of law. See Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010).

The parties agreed that any dispute concerning the Settlement will be governed by New York substantive law. Richardson Moving Decl., Ex. 4 § 17 ("This Settlement Agreement will be governed by and interpreted in accordance with the laws of the State of New York without giving effect to any choice of law rules."). "[I]n cases involving a contract with an express choice of law provision ... a court is to apply the law selected

15

in the contract as long as the state selected has sufficient contacts with the transaction." Aramarine Brokerage, Inc. v. OneBeacon Ins. Co., 307 F. App'x 562, 564 (2d Cir. 2009).

### III.

Embarcadero moves for summary judgment in its favor on its claims for breach of contract and declaratory relief and against NCR on NCR's claims for breach of contract and declaratory relief.

### A.

For Embarcadero to obtain summary judgment against NCR on Embarcadero's breach-of-contract claim, Embarcadero must show: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).

Embarcadero argues that NCR breached the Settlement by refusing to pay the invoices for the 4,289 alleged additional activations by NCR customers between April 1, 2023, and September 12, 2025. The Settlement requires NCR to pay any "additional activations" of Interbase "after March 31, 2023" at the "pric[e] set forth in Schedule No. 3." Richardson Moving Decl., Ex. 4 § 4. According to Embarcadero, the Settlement unambiguously provides that "additional activation" means an activation on a new machine by an already-activated license key after

16

March 31, 2023. Def.'s Mem. Supp. Mot. Summ. J. ("Embarcadero's Summ. J. Mot.") 6, ECF No. 71. And Embarcadero insists that its call-home reports, after deduplication, track exactly that metric.

Embarcadero has failed to show that it is entitled to summary judgment on this claim, however, because there are at least two genuine disputes of material fact. First, the term "additional activation" is ambiguous, and the extrinsic evidence does not undisputedly support Embarcadero's interpretation. And second, it is unclear that Embarcadero's call-home reports accurately exclude false positives.

**1.**

Section 4 of the Settlement provides that

> all licenses and sublicenses to the Subject Interbase Software provided to [NCR] and end users as of March 31, 2023 are permitted for continued use by the Parties without additional license fees or penalties. If <u>additional activations</u> of such licensed and sublicensed Subject Interbase Software are made after March 31, 2023, such <u>additional activations</u> will be at the newly agreed pricing set forth in Schedule No. 3....

Richardson Moving Decl., Ex. 4 § 4 (emphases added). The parties agree that "activation" refers to the registration and validation of licensed software when it is initially installed. Usner Decl. ¶ 32; Wheeler Dep. Tr. at 62:16–23. They disagree, however, about the meaning of "additional."

17

Embarcadero argues that "[t]he unambiguous, plain language of the [Settlement] ... provides that all additional activations will incur license fees." Embarcadero's Summ. J. Mot. 15. On this reading, an additional activation occurs whenever an already-activated license key is activated on a new machine after March 31, 2023. NCR, by contrast, argues that "additional activation" refers unambiguously to a net increase in the total amount of activations by NCR's customers. Pl.'s Mem. Supp. Mot. Summ. J. ("NCR's Summ. J. Mot.") 17–19, ECF No. 86; see also Pl.'s Mem. Opp'n Mot. Summ. J. ("NCR's Summ. J. Opp'n") 17, ECF No. 95. On this reading, redeployments of existing licenses on new or repaired machines would not necessarily count as an additional activation.

Although both parties argue that the plain language of the Settlement supports their positions, the meaning of "additional activation" is ambiguous. Under New York law, the Court may construe a contract as a matter of law only if the contract is unambiguous on its face. See Metro. Life Ins. v. RJR Nabisco Inc., 906 F.2d 884, 889 (2d Cir. 1990); Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005). A contract is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Sayers v. Rochester Tel. Corp. Supplemental

Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993). Where, on the other hand, the contractual language is subject to more than one reasonable meaning and where extrinsic evidence of the parties' intent exists, the question of the proper interpretation should be submitted to the trier of fact unless the extrinsic evidence is so one-sided that no reasonable jury could find in favor of the non-moving party. See 3Com Corp. v. Banco do Brasil, S.A., 171 F.3d 739, 746-47 (2d Cir. 1999).

In this case, there is a genuine factual dispute about whether "additional activation" refers to any redeployment of Interbase on a new machine after March 31, 2023, as Embarcadero argues, or instead to net increases in the number of licenses active on NCR's customers' devices, as NCR argues. Embarcadero points to the fact that the text of Section 4 lacks qualifying language, and it is certainly reasonable to read "additional activation" to encompass redeployments of existing licenses. But it is also plausible, as NCR argues, to read "additional activation" to apply to a narrower set of activations — namely, those that add to the total number of activations. In support of its reading, NCR notes that several dictionaries define "additional" to connote some net increase. See, e.g., Additional, New Oxford American Dictionary (3d ed. 2010) ("added, extra, or supplementary to what is already present or available"); Additional, Oxford English Dictionary (3d ed.,

19

updated 2025) ("in addition to something else; added, extra, supplementary").

NCR also contends that its definition of "additional" makes better sense of other provisions of the Settlement. Specifically, NCR notes that Section 4 of the Settlement and Schedule No. 3 to the VAR Agreement respectively provide for the "continued use" and "continued use and support" of licenses activated before March 31, 2023 "without additional license fees or penalties." Richardson Moving Decl., Ex. 4 § 4; Richardson Moving Decl., Ex. 6 § 3. Because the VAR Agreement provides for perpetual end-user sublicenses without any durational limit, Wheeler Dep. Tr. at 25:19-21, NCR contends that the "continued use" language must do something more than guarantee the ongoing validity of licenses existing at the time of the Settlement. According to NCR, "continuing use" therefore refers to routine maintenance activities like reimaging and redeployments following hardware replacements, and the provision is meant to ensure that those activities do not incur fees.

Embarcadero argues in response that NCR misreads the "continued use" provision. According to Embarcadero, this provision authorizes those NCR customers who were using Storepoint before March 31, 2023 but whose licenses were not properly reported to Embarcadero to continue using the software as if NCR had properly paid for it in the first place. Def.'s Mem. Opp'n Summ.

20

J. ("Embarcadero's Summ. J. Opp'n") 13, ECF No. 108. Rather than exempting certain kinds of routine maintenance from fees, Embarcadero contends that this provision "relates to the going forward treatment of licenses to which, but for this language, NCR would have had no right to continued use given its failure to properly account and pay for them." Id. If anything, this collateral dispute about the meaning of "continued use" merely reinforces the conclusion that "additional activation" is susceptible of multiple reasonable interpretations.

The extrinsic evidence is also not so decisive that no reasonable jury could find in favor of NCR. See 3Com Corp., 171 F.3d at 746-47. Embarcadero insists that the extrinsic evidence in the record shows that the parties intended for any activations identified in Embarcadero's call-home reports to qualify as "additional activations." For example, Embarcadero points to Cusack's deposition testimony that the call-home data provided by Embarcadero was, "based on the settlement, ... something that [NCR] could look to leverage to control [activations] moving forward." Cusack Dep. Tr. at 89:16-90:12. But the very same deposition testimony suggests that the parties did not understand "additional activation" to mean all activations identified in Embarcadero's call-home reports. When asked whether "the plan on a going-forward basis was to leverage the call-home data to identify activations for which a license fee

21

was incurred," Cusack answered, "A net new activation, yes." Id. at 95:1-5. He went on to explain that "what [NCR was] targeting with the call-home data" was "a net new installation or a net new store, which would require a new license." Id. at 95:7-10. And the Settlement did not expressly incorporate the call-home data as the binding measurement.

NCR also points to record evidence postdating the Settlement but predating this litigation suggesting that Embarcadero at one point understood "additional activation" to refer to a net increase in Interbase licenses. For example, on December 11, 2023, one of Embarcadero's lawyers wrote to NCR to explain that Embarcadero's call-home reports "evidence[d] 'additional activations' of net new licenses as contemplated by Section 4 of the [Settlement] Agreement." Richardson Opp'n Decl., Ex. 4 at NCR-EMB-000005401, ECF No. 99-4. Embarcadero at this time thus argued not that "additional activation" referred to any activation flagged in Embarcadero's call-home reports, but rather that the call-home data "in fact [reflected] a net new license to a new machine."[2] Id.

### 2.

Moreover, Embarcadero would not be entitled to summary judgment based on the alleged reliability of its call-home data

---

[2] As explained below, the parties also dispute whether Embarcadero's call-home reports accurately track this data.

because factual disputes about the accuracy of the call-home data abound.

NCR contends, for example, that Embarcadero's call-home reports flag redeployments of Interbase following reimaging. NCR's 56.1 Statement ¶¶ 51-52; see also Ball. Dep. Tr. at 38:16-40:2, 66:4-14. According to NCR, reimaging causes servers running on a Microsoft Windows operating system to generate a new DeviceID, and therefore Embarcadero's deduplication process will not filter out those redeployments of existing Interbase licenses. NCR Usner Dep. Tr. at 97:19-25; see also id. at 160:9-161:11. Embarcadero responds that devices using a Microsoft Windows operating system are assigned multiple identification values, and only some change during the reimaging process. But which value Embarcadero's deduplication process identifies and whether that value remains the same following reimaging is a factual dispute for the factfinder to resolve.

NCR also points to record evidence that many of the alleged additional activations coincided with customers' Storepoint updates. For example, one of NCR's employees, Robert Usner, testified during his deposition that he spoke with a representative from TA in early 2024 and learned that TA had updated its Storepoint software across its sites during the period between April 2023 and September 2023, when Embarcadero's call-home software flagged 605 alleged additional activations. Embarcadero

Usner Dep. Tr. at 138:8-16; see also Richardson Moving Decl., Ex. 10 at NCR-EMB-000015135, ECF No. 89-10. Usner concluded that eighty-eight percent of these alleged activations occurred during the two-month period when TA updated Storepoint across all its servers. Richardson Moving Decl., Ex. 9, ECF No. 89-9; see also Usner Decl. ¶ 45 ("[T]he call-home report indicated that 532 of those alleged activations (approximately 88%) had occurred in May-June 2023. This pattern would be consistent with testing the software update on a handful of servers in April 2023, rolling it out across the entirety of TA's inventory in May, June, and perhaps early July, then cleaning up configuration issues and bugs that arose during the rollout between July and September 2023.").

Embarcadero contends that Usner's investigation into the call-home reports was a "sham ... with a predetermined outcome," Embarcadero's Summ. J. Mot. 10, and notes that his call with TA "was not specific to the call-home data," but instead "was related to the migration approach for sites that that customer had," Reply Mem. Supp. Def.'s Mot. Summ. J. ("Embarcadero's Reply") 5 n.3, ECF No. 118. But whether Usner's testimony about his investigation is reliable is a matter for the factfinder.

\*     \*     \*

NCR has identified genuine disputes of material fact regarding the meaning of the term "additional activations" in the

24

Settlement and Schedule No. 3 of the VAR Agreement, the intentions of the parties with respect to the use of call-home data, and the accuracy of call-home data in screening out redeployments of existing Interbase licenses after reimaging or hardware maintenance. Accordingly, Embarcadero's motion for summary judgment on its breach-of-contract claim is **denied.**

**B.**

Embarcadero also moves for summary judgment on its declaratory-judgment claim, which seeks a declaration that NCR materially breached the Settlement and thus that Embarcadero has a right to terminate both the VAR Agreement and the Settlement. "Under New York law, when one party has committed a material breach of a contract, the non-breaching party is discharged from performing any further obligations under the contract, and the non-breaching party may elect to terminate the contract and sue for damages." NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd., 262 F. Supp. 2d 134, 145 (S.D.N.Y. 2003).

Embarcadero is not entitled to summary judgment on its declaratory-judgment claim for the same reason it is not entitled to summary judgment for its breach-of-contract claim: whether the activations invoiced to NCR qualify as "additional activations" within the meaning of the Settlement, and thus whether NCR's failure to pay those invoices constitutes a breach of the Settlement, are genuine factual disputes.

25

**C.**

Finally, Embarcadero seeks summary judgment dismissing NCR's claims for breach of contract and declaratory relief. NCR claims that Embarcadero breached the Settlement by deactivating paid-for customer licenses existing on or before March 31, 2023. Compl. ¶¶ 71-78, ECF No. 1. NCR also seeks a declaratory judgment that similar deactivations in the future would constitute breach of the Settlement.

Embarcadero argues that it is entitled to summary judgment because the record evidence shows that NCR requested that Embarcadero deactivate those licenses. Embarcadero notes, for example, that on September 12, 2023, Cusack informed Wheeler that "Embarcadero need[s] to stop these activations." Embarcadero's 56.1 Statement ¶ 87; DeGennaro Moving Decl., Ex. 32 at NCR-EMB-000008563. Wheeler responded that Embarcadero was "happy to move forward with shutting down the existing licenses and will use this as notice." Embarcadero's 56.1 Statement ¶ 88; DeGennaro Moving Decl., Ex. 32 at NCR-EMB-000008563. In November 2023, Embarcadero began to deactivate NCR's customers' licenses. Embarcadero's 56.1 Statement ¶ 95; see also Wheeler Dep. Tr. at 144:2-6. Three of NCR's customers — Love's Travel, Pilot, and TA — experienced Storepoint software failures because their existing Interbase licenses were disrupted. Embarcadero's 56.1 Statement ¶ 98; see also Embarcadero

26

Usner Dep. Tr. at 167:21–168:5. According to Embarcadero, these NCR customers experienced software disruptions because they used more versions of Interbase than NCR had paid for or were otherwise misusing the software. Embarcadero's 56.1 Statement ¶¶ 100-02; Wheeler Dep. Tr. at 167:2-9. On April 12, 2024, NCR requested that Embarcadero reactivate the deactivated licenses, and Embarcadero did so. Embarcadero's 56.1 Statement ¶¶ 105-06.

NCR contends that it never agreed to deactivate existing licenses that were active as of March 31, 2023. Rather, NCR asked Embarcadero to disable <u>new</u> activations of existing licenses, which were the source of the post-Settlement over-deployment dispute. NCR points to correspondence from Embarcadero noting that Embarcadero was "in the process of disabling <u>new activations</u> on [NCR's] existing licenses per [NCR's] communications on September 12, 2023." Richardson Moving Decl., Ex. 7 at EMBARC0001859, ECF No. 89-7. Embarcadero assured NCR in this letter that "[p]reviously activated software will continue to work as before." <u>Id.</u> Similarly, Cusack stated in his September 12, 2023 email to Wheeler that "NCR is not authorising any <u>further license activations</u> of previously settled licenses, and that Embarcadero need[s] to stop th[o]se activations." Richardson Opp'n Decl., Ex. 6 at EMBARC0000004, ECF No. 99-5.

Because there are genuine factual disputes about whether NCR authorized Embarcadero's deactivation of existing licenses

27

and whether any deactivations were caused by NCR's customers' misuse, summary judgment is inappropriate. Embarcadero's motion for summary judgment dismissing NCR's breach-of-contract and declaratory-judgment claims is therefore **denied.**

## IV.

NCR separately moves for summary judgment dismissing Embarcadero's claims for breach of contract and declaratory relief. But NCR's request for summary judgment against Embarcadero's counterclaims fails for the same reasons as Embarcadero's request for summary judgment in favor of its counterclaims — there are genuine factual disputes about the meaning of "additional activation," the intentions of the parties regarding the use of call-home data, and the accuracy of that call-home data in screening false positives. NCR's motion for summary judgment dismissing Embarcadero's breach-of-contract and declaratory-relief claims is therefore **denied.**

## V.

The Court has considered all the arguments raised by the parties. If any argument was not specifically addressed, it is

28

either moot or without merit. For the foregoing reasons, the parties' cross motions for summary judgment are **denied.**

The Clerk is respectfully requested to close all open motions.

**SO ORDERED.**

Dated:    **New York, New York**
           **March 4, 2026**

                                    **John G. Koeltl**
                         **United States District Judge**

29